Casey Fronk (Illinois Bar No. 6296535)
fronkc@sec.gov
Daniel J. Wadley (10358)
wadleyd@sec.gov
Amy J. Oliver (8785)
olivera@sec.gov
Cheryl M. Mori (8887)
moric@sec.gov
Attorneys for Plaintiff
Securities & Exchange Commission
351 S. West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel.  801-524-5796
Fax: 801-524-5262

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>PLAINTIFF,<br><br>v.<br><br>WILLIAM J. BOWSER, an individual, CHRISTOPHER J. ASHBY, an individual, SCOTT W. BEYNON, an individual, and JORDAN S. NELSON, an individual,<br><br>DEFENDANTS. | **COMPLAINT**<br><br>Case No.:<br><br>Judge: |

Plaintiff, Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants William J. Bowser, Christopher J. Ashby, Scott W. Beynon, and Jordan S. Nelson (collectively, "Defendants") alleges as follows:

## INTRODUCTION

1. This case involves an offering fraud related to Noah Corporation ("Noah"), the operator of commercial event centers, and Rockwell Debt Free Properties, Inc. ("Rockwell"), a seller of securities in Noah.

2. William J. Bowser, the founder and (former) President of Noah, along with Christopher J. Ashby, Scott W. Beynon, and Jordan S. Nelson, the founders and owners of Rockwell (the "Rockwell Defendants"), made material misrepresentations and omissions to sell securities comprising fractional, tenant-in-common interests in Noah event centers (herein, the "Noah TIC Interests"). The Noah event centers were, collectively, an unprofitable enterprise sustained only through infusions of new investor funds.

3. Through their misconduct, the Defendants convinced approximately 90 investors to purchase over $35.9 million in securities in the form of Noah TIC Interests between approximately January 2017 and February 2019.

4. The Defendants did not use investor funds as outlined in their offering materials and in their related discussions with investors.

5. Bowser misappropriated and diverted investor funds meant for the development and construction of new event centers to sustain the existing operations of Noah, and the Rockwell Defendants approved Bowser's funding requests without review.

6. Many investors who thought they were purchasing an interest in a thriving event center were left with merely a piece of undeveloped land.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction by authority of Sections 20 and 22 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77t and 77v], and Sections 21 and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u and 78aa].

8. Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of interstate commerce and the mails in connection with the transactions, acts and courses of business alleged herein, certain of which have occurred within the District of Utah.

9. Venue for this action is proper in the District of Utah under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the transactions, acts, practices, and courses of business alleged in this Complaint took place in this district and because the Defendants reside in and transact business in this district.

10. Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged herein, and in transactions, acts, practices, and courses of business of similar purport and object.

11. Defendants' conduct took place in connection with the offer, purchase and/or sale of securities.

## DEFENDANTS

12. William "Bil" J. Bowser, age 58 and a resident of Salt Lake City, Utah, was the founder and President of Noah. Noah had a board of directors consisting of Bowser and two other individuals. Bowser was the principal and control person of Noah. He managed and

controlled Noah's operations and interacted with Rockwell's Noah TIC Interest investors until May 2019.

13. Christopher J. Ashby, age 46 and a resident of Sandy, Utah, was a founder, President, CEO, and 32 ½ percent owner of Rockwell. Ashby solicited investors to purchase Noah TIC Interests.

14. Scott W. Beynon, age 43 and a resident of Kaysville, Utah, was a founder, Vice President, and 30 percent owner of Rockwell. Beynon solicited investors to purchase Noah TIC Interests.

15. Jordan S. Nelson, age 39 and a resident of Sandy, Utah was a founder, an Officer, and 17 ½ percent owner of Rockwell. Nelson solicited investors to purchase Noah TIC Interests.

## RELATED ENTITIES

16. Noah Corporation is a Utah corporation based in South Jordan, Utah. Noah was formed in September 2003 by Bowser and was a private company owned by Bowser and approximately 500 other shareholders. Noah filed for Chapter 11 bankruptcy in May 2019, and began operating under a restructuring plan. In February 2020, the bankruptcy was converted to Chapter 7, and Noah was ordered to relinquish its operations.

17. Rockwell Debt Free Properties, Inc. is a Utah corporation, formed in October 2009 and based in Sandy, Utah. The owners of Rockwell are Ashby (32 ½ percent owner), Beynon (30 percent owner), Nelson (17 ½ percent owner), and two silent partners (10 percent each). Rockwell previously operated as Rockwell TIC, Inc., a Utah corporation, formed in August 2006. Rockwell filed for Chapter 7 bankruptcy on November 2, 2020 and has ceased operations.

18.     Gabriel Management Corporation ("Gabriel") is a Utah corporation, formed in September 2005.  Bowser owned and controlled Gabriel and is its President and sole Director.  Gabriel operated as Noah's construction arm and did business as "Noah's."  Gabriel developed event center properties and made a profit on the construction of those properties.  Gabriel's business registration expired July 15, 2020, and Gabriel is no longer in operation.

## STATEMENT OF FACTS

### Noah Corporation

19.     Noah, through Bowser, began developing and operating event centers around 2005.  Bowser envisioned a national network of high-end event centers, and sold investors on that vision. Noah opened its first event center in January 2007, and by May 2019, Noah operated forty-two event venues across the United States.

20.     Around 2013, Bowser decided to sell Noah's event centers (building and real property) and lease them back as a tenant, rather than being an owner-operator of the event centers.  In this way, Bowser was able to obtain influxes of cash for current obligations, albeit with the result that Noah's liabilities and monthly expenses increased dramatically because Noah was obligated to make rental payments to the purchasers of the event centers.

21.     Bowser established another Utah corporation, Gabriel, to develop Noah's event center properties for profit.  Although Gabriel and Noah had separate bank accounts, Bowser continually transferred and commingled funds between accounts.  Nearly all the event centers were losing money.  Without the continual influx of investor monies and Gabriel's construction profits, Noah could not have sustained the operations of its event centers.

22.     Bowser received a salary from Noah.  All or most of the salary Bower received from Noah from approximately January 2017 through February 2019 came from new investor funds as Noah was not profitable otherwise.

### Rockwell Debt Free Properties, Inc.

23.     The Rockwell Defendants formed Rockwell in or around 2009 to purchase commercial properties and resell them for profit.

24.     The Rockwell Defendants profited by marking up the price of properties they acquired and selling the property off in fractional, tenant-in-common interests to various investors.

25.     The Rockwell Defendants received salaries from Rockwell.  The salaries paid to the Rockwell Defendants by Rockwell from approximately January 2017 through February 2019 included funds from Noah TIC Interests.

### Rockwell and Noah Partner Together

26.     In 2013, Rockwell began soliciting investors to purchase Noah TIC Interests. Initially, the event centers that were the subject of the Noah TIC Interests were already fully developed and operating.

27.     In or around 2015, the Rockwell Defendants and Bowser agreed to develop additional properties together.  Pursuant to the parties' agreements, Bowser, through Noah's construction arm, Gabriel, was to locate new properties (in the form of raw land) and construct event centers on those properties.  Rockwell was to provide funds to purchase the raw land and finance the development and construction of each event center for an agreed-upon price, which included a profit to Gabriel.  Rockwell, as owner of each new property, would then negotiate and enter into a lease agreement with Noah as the tenant.

28. The Rockwell Defendants offered and sold Noah TIC Interests in the undeveloped properties to fund the land purchase and construction costs, and subsequently would assign the lease to the Noah TIC Interest investors. By July 2019, Rockwell had purchased 34 Noah properties for investment and resale to investors.

29. Although the unbuilt event centers were not generating revenues, Rockwell guaranteed to Noah TIC Interest investors that rents would be paid from the time of the investor's purchase of the Noah TIC Interest. But, while Rockwell paid rents to Noah TIC Interest investors for the first nine months after their purchase, it also included the cost of these nine-month rental payment periods in the total price it charged investors for the Noah TIC Interests. This structure was not disclosed to investors.

30. The guaranteed rents from time of purchase were touted as an incentive to purchase Noah TIC Interests, and helped to drive interest in Noah TIC Interests, because it gave the false appearance that Noah was a thriving company.`

**Promotion and Sale of Noah TIC Interests**

31. The Rockwell Defendants also provided written materials and additional information to potential Noah TIC Interest investors claiming that Noah was profitable. The written marketing materials stated that Noah had "demonstrated [the] ability to examine and modify [its] business to achieve maximum profitability," and that "Noah's anticipates revenues to well exceed the debt service and operating cost with their breakeven well below their currently operating occupancy levels."

32. For those event centers that were not yet developed, the brochures contained photos and renderings of a completed event center, but did not make clear that the centers in which investors would be purchasing an interest were still in development.

33. All Defendants made oral representations to potential investors that Noah was profitable and stable to induce potential investors to purchase Noah TIC Interests.

34. Many investors believed that those undeveloped event centers in which they purchased interests were completed and already generating revenues at the time of their purchase, based on the information contained in the written marketing materials and representations made to them by all Defendants, as well as their receipt of monthly rental payments.

35. Although claiming to conduct a thorough analysis of the tenants in their TIC offerings, the Rockwell Defendants did not conduct due diligence on Noah, as represented in conjunction with investors' purchase of the Noah TIC Interests. Instead, the Rockwell Defendants relied mainly on Bowser's oral representations about the operation and profitability of Noah.

36. From at least March 2015 through at least February 2017, the Rockwell Defendants reviewed financial statements showing that Noah was operating at net losses in 2014, 2015, and 2016, of $3.1 million, $3.3 million, and $3.2 million, respectively. The financial statements further showed that Noah had accumulated losses of approximately $8 million, and had only $3.5 million in assets with $11.5 million in liabilities.

37. The Rockwell Defendants and Bowser knew or should have known that their representations and omissions about Noah's financial condition and future prospects, including that Noah was profitable, were false or misleading.

### Noah's Worsening Financial Problems

38. In or around late 2016 and early 2017, Bowser and Ashby had discussions about Noah's financial difficulties; including Noah's construction cost overruns, construction delays,

and other issues. Based on these representations by Bowser, Rockwell loaned Noah $6 million in January 2017.

39. The $6 million loan did nothing to alleviate Noah's financial problems. The money was quickly spent to satisfy current obligations, including rents due to Noah TIC Interest investors.

40. The Rockwell Defendants and Bowser failed to disclose to prospective Noah TIC Interest investors their knowledge of Noah's financial difficulties or the $6 million loan.

## Misappropriation of Investor Funds

41. The Rockwell Defendants represented to investors that their investment funds would be placed into escrow at the title company and disbursed only to purchase an interest in a specific property or to pay for the construction of improvements on the property on a reimbursement basis. In practice, however, Rockwell did not segregate funds in escrow.

42. Contrary to the Rockwell Defendants' representations to investors, Rockwell's and Noah's practice was for Rockwell to receive funds from escrow as soon as Rockwell purchased the raw land for a new event center. Rockwell would then disburse the investor funds to Gabriel, Noah's construction arm, upon receiving a draw request from Bowser on Gabriel's behalf. The draw requests consisted of a form spreadsheet with a list of various construction expenses.

43. Rockwell regularly disbursed funds to Gabriel in response to Bowser's draw requests, but had no controls in place to ensure that the itemized expenses listed in the form spreadsheets were legitimate. The Rockwell Defendants failed to conduct a reasonable inspection to verify that the construction work claimed to be expensed was actually completed.

44. In fact, the draw requests Bowser submitted to Rockwell were fraudulent, and did not list actual expenses. Because Noah never generated enough income to cover its expenses, Bowser regularly used the Gabriel draw requests to obtain investor funds from Rockwell to cover expenses associated with Noah's current operations, including rent payments. Bowser directed that the Gabriel draw requests be falsified to list construction expenses that were not incurred, but that equaled the amount Noah needed at the time to fund its operating expenses and other obligations.

45. In this way, Bowser diverted investor funds earmarked for specific properties and instead used them for Noah's and Bowser's operational and other expenses, and payments to prior investors (through rental payments to Noah TIC Interest owners), rather than for construction of new event centers, as represented.

46. Funds allocated for a specific property were thereby depleted with little or no development. To date, five Noah event center properties remain undeveloped, and all the funds provided by investors through the purchase of Noah TIC Interests for those properties have been depleted.

47. The Rockwell Defendants knew or should have known that the Gabriel draw requests were fraudulent, because the draw requests included construction expenses that were facially inconsistent with the state of development at the new Noah event center properties. For example, Gabriel requested (and received) over twenty percent of the total funds allotted for construction before Rockwell had even purchased the raw land for twelve different Noah event centers under development. Upon a reasonable inspection, it should have been clear that most or all of these expenses could not have been incurred when the land necessary to construct the event centers had not yet been acquired.

48. In or around February 2019, Rockwell informed Bowser that it would no longer develop new event center properties with Noah. This eliminated Noah's access to new Noah TIC Interest investor funds and, as a result, Noah began to miss rent payments owed to existing Noah TIC Interest investors.

49. With the unpaid rent payments, Noah's financial problems were revealed to Noah TIC Interest investors. Some investors learned for the first time that the properties in which they purchased an interest, which they previously believed contained fully developed and revenue-generating event centers, were merely undeveloped pieces of land.

### Defendant Bowser Acted With Scienter

50. Bowser knowingly engaged in a long-running course of conduct designed to deceive investors.

51. Bowser commingled investor funds and used new investor funds to pay returns to earlier investors in the form of rents to Noah TIC Interest investors.

52. Bowser was fully aware of Noah's financial difficulties because he controlled all of Noah's operations and finances.

53. Bowser has admitted under oath that he knowingly misappropriated and diverted investor funds and that he routinely used revenues from some properties to cover shortfalls at others. In a call with Rockwell investors, Bowser additionally admitted he "robbed Peter to pay Paul."

54. Bowser has also admitted under oath that he knowingly falsified draw requests to Rockwell to obtain investor funds to use improperly.

**Noah TIC Interests Are Securities**

55.     The Noah TIC Interests are investment contracts.

56.     Investors invested money with Rockwell to purchase individual Noah TIC Interests in real property.

57.     The investment in Noah TIC Interests was a common enterprise and an opportunity for profit.  Investor monies were pooled together to fund the purchase and/or construction of a specific operating and functional event center, of which each investor would own a percentage of the building and land, in order to provide investors with profits in the form of rental income.

58.     The Noah TIC Interest investors expected profits based on the efforts of others, in particular, Rockwell and Noah.  Rockwell and/or Noah or their agents were responsible for the location, purchase, development, and construction of the buildings, as well as all management, operations, and maintenance of the event centers to generate profits.  The Rockwell Defendants represented and marketed the Noah TIC Interests as a "passive" investment in which the Noah TIC Interest investors had no managerial responsibilities and had only to collect their monthly rental checks.

59.     The Rockwell Defendants regularly solicited and negotiated with investors to purchase Noah TIC Interests in specific Noah properties prior to Rockwell actually acquiring a fully developed property.  All TIC owners, including Rockwell, were subject to a Tenancy in Common Agreement.  Noah TIC Interests were also subject to a "Property Administrator Agreement, which provided that the PA may only be terminated by written notice signed by all co-owners of the property.

**FIRST CAUSE OF ACTION**
**EMPLOYMENT OF A DEVICE, SCHEME OR ARTIFICE TO DEFRAUD**
**Violation of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]**
**(Bowser)**

60. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 59 above.

61. Defendant Bowser, by engaging in conduct described above, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with scienter, employed devices, schemes, or artifices to defraud.

62. By reason of the foregoing, Defendant Bowser, directly or indirectly, violated, and unless restrained and enjoined by this Court, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**SECOND CAUSE OF ACTION**
**FALSE STAEMENTS OR OMISSIONS IN THE OFFER OR SALE OF SECURITIES**
**Violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]**
**(Ashby, Beynon, and Nelson)**

63. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 59 above.

64. Defendants Ashby, Beynon, and Nelson, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with negligence, obtained money or property by means of untrue statements of material facts and omissions.

65. By reason of the foregoing, Defendants Ashby, Beynon, and Nelson, directly or indirectly, violated, and unless restrained and enjoined by this Court, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]

### THIRD CAUSE OF ACTION
### FRAUD IN THE OFFER OR SALE OF SECURITIES
Violations of Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)]
(Bowser, Ashby, Beynon, and Nelson)

66. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 59 above.

67. Defendants Bowser, Ashby, Beynon, and Nelson, by engaging in the conduct described above, directly and indirectly, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with negligence or scienter, engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

68. By reason of the foregoing, Defendants Bowser, Ashby, Beynon, and Nelson, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

### FOURTH CAUSE OF ACTION
### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
Violations of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]
(Bowser)

69. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 59 above.

70. Defendant Bowser by engaging in the conduct described above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the mails, in connection with the purchase or sale of securities, with scienter, employed devices, schemes, or

artifices to defraud, or engaged in acts, practices, or courses of business that operated or would operate as a fraud and deceit upon other persons.

71. By reason of the foregoing, Bowser violated, and unless restrained and enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

**FIFTH CAUSE OF ACTION**
**UNREGISTERED BROKER DEALER**
**Violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]**
**(Ashby, Beynon, and Nelson)**

72. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 59 above.

73. Defendants Ashby, Beynon, and Nelson, by engaging in the conduct described above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the mails, in connection with the purchase or sale of securities, effected transactions in, or induced or attempted to induce the purchase or sale of securities, without being registered with the Commission.

74. By reason of the foregoing, Defendants Ashby, Beynon, and Nelson violated, and unless restrained and enjoined will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)].

**RELIEF REQUESTED**

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Finding that Defendants violated the securities laws and rules promulgated thereunder as alleged against them herein.

### II.

Permanently restraining and enjoining Defendants from violating, directly or indirectly, the securities laws and rules promulgated thereunder they are alleged to have violated.

### III.

Ordering Defendants to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts.

### IV.

Ordering Defendants to pay civil monetary penalties pursuant to 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)].

### V.

Granting such other and further relief as the Court may deem just and proper.

### VI.

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

Dated this 30th day of December 2020.

Respectfully submitted,

__/s/ *Casey Fronk*_____
Casey Fronk
U.S. Securities and Exchange Commission
*Attorneys for Plaintiff*